IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

WILLIAM J. MUMM,

                       Plaintiff,              Civil Action No.

v.                                     5:06-CV-0989 (GLS/DEP)

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

                       Defendant.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

OOT & ASSOCIATES, PLLC        NEAL P. MCCURN, JR., ESQ.
503 E. Washington Street
Syracuse, New York 13202

FOR DEFENDANT:

HON. GLENN T. SUDDABY        ANDREEA LECHLEITNER, ESQ.
United States Attorney for the     Special Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

OFFICE OF GENERAL COUNSEL    BARBARA L. SPIVAK, ESQ.

_____

[1]     Plaintiff's complaint, which was filed on August 9, 2006, named Jo Anne B. Barnhart, the former Commissioner of Social Security, as the defendant.  On February 12, 2007, Michael J. Astrue took office as Social Security Commissioner.  He has therefore been substituted as the named defendant in this matter pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, and no further action is required in order to effectuate this change.  *See* 42 U.S.C. § 405(g).

Social Security Administration          Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff William J. Mumm, who was previously found by the

Commissioner to have been disabled as a result of lumbar back and

gastroastroesophageal reflux disorder ("GERD") medical conditions, and thus

entitled to Social Security benefits, has commenced this proceeding pursuant

to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a more recent decision of the Commissioner

concluding that plaintiff's medical condition has improved and he is no longer

disabled and entitled to disability insurance benefits. In support of his

challenge to that determination, plaintiff maintains that the administrative law

judge ("ALJ") assigned by the agency to hear and determine the matter

inexplicably discounted opinions of his treating physicians suggesting that at

best plaintiff's back condition remains unimproved, and quite possibly may

have worsened, improperly elevating contrary opinions of non-examining

consultants over those of his treating physicians.  Plaintiff also contends that

the ALJ's determination overlooks the impact of a new knee injury on his

-2-

ability to perform work-related functions as well as the effects of a non-exertional impairment, in the form of a significant learning disability, thereby rendering the ALJ's resort to the medical vocational guidelines set forth in the governing regulations (the "grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, inappropriate.  Finally, the plaintiff argues that in finding no disability the ALJ improperly discounted his complaints of disabling pain, without appropriate explanation.

Having carefully reviewed the record which was before the agency, in light of plaintiff's various arguments, and applying the requisite deferential standard, I find that the Commissioner's finding of medical improvement and no disability resulted from the application of proper legal principles, and is well-supported by substantial evidence.

I.      BACKGROUND

    A.      General Background

Plaintiff was born in 1966; at the time of the administrative hearing in this matter he was thirty-nine years old.  Administrative Transcript at 34, 87.[2] Mumm completed high school, and at the time of the hearing was in his third

---

[2]      Portions of the administrative transcript, Dkt. No. 3, filed by the Commissioner and comprised of proceedings and evidence before the agency, will be cited as "AT ___."

semester as a student at Onondaga Community College.  AT 38.  Plaintiff's

past relevant work history includes employment as a machine operator.  *Id.*;

*see also* AT 98.  Plaintiff alleges disability due to pain in his lower back and

both legs, with resulting limitations, and additionally based upon the existence

of a learning disability.[3]  AT 39-49.

> B.    Treating Sources

Medical evidence amassed prior to December 8, 1999, the date of an

earlier agency determination finding that Mumm was disabled and thus

entitled to benefits under the Act, reveals that he was diagnosed with

spondylolisthesis and spondylolysis.[4,5] Magnetic resonance imaging ("MRI")

testing conducted in September 5, 1996 disclosed minimally diffusely bulging

posterior anulus of the L4-5 disc, a finding which was reportedly of "uncertain

clinical significance."  AT 132.  An X-ray of plaintiff's spine, taken on August

14, 1996, revealed the existence of spondylolisthesis and spondylolysis.  AT

---

[3]      Plaintiff's back injury apparently stems from a work-related injury occurring on August 11, 1996, when, while driving a tow motor at work, plaintiff struck a pot hole, injuring his lower back.  AT 135.  That incident apparently aggravated a pre-existing condition dating back to May of that year, resulting from an injury suffered when plaintiff lifted a thirty pound bar and threw it into a tub.  AT 134.

[4]      The ALJ has referred to that determination as the "comparison point decision" ("CPD"), and I will do likewise.

[5]      Spondylolisthesis is the forward displacement of one vertebra over another; spondylolysis, by contrast, is the dissolution of a vertebra.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1779, 1780 (31st ed. 2007).

134.  Dr. Cambareri's impression, upon review of those records, was that plaintiff suffers from "a slight spondylolesthesis of L5 on S1".  *Id.*  Based upon his assessment and examination, Dr. Cambareri prescribed Darvon, and recorded his impression that plaintiff suffered from a temporary disability.  *Id.*

Plaintiff continued to treat with Dr. Cambareri on a periodic basis, and with Dr. Richard G. Zogby, who in June of 1998 was consulted for a second opinion.  *See* AT 143.  Noting the possibility of a grade one spondylolisthesis at L5-S1, but no other abnormality, and with no significant nerve compression, Dr. Zogby recommended a brace on a trial basis, in anticipation of possible surgery involving a fusion.  AT 143, 144.  In June of 1998, Dr. Cambareri noted that recommendation and stated his impression that plaintiff suffered from lumbosacral sprain, sciatic as well as underlying spondylotlisthesis of L5-S1, but noted that he did not appear to be in acute distress.  AT 144.  Throughout 1998, Dr. Cambareri continued to recommend that plaintiff not work, particularly in any situation involving repetitive bending or lifting of more than ten pounds.  *See* AT 146.

On September 29, 1999, plaintiff sought emergency room treatment after experiencing radiating pain in his right calf and foot, attributed to a flare up of his chronic sciatica.  AT 179-84.  Treatment providers in the St.

Joseph's Hospital Emergency Room confirmed that plaintiff appeared to be experiencing an exacerbation of his chronic condition, without any evidence of new injury to his back, and administered Percocet in the emergency room, with a follow-up prescription for Vicodin as well as Motrin.  AT 181.

Treatment notes from Dr. Cambareri for the period from January 8, 1999 through May 10, 1999 reflect that plaintiff's condition remained relatively stable.  AT 167-70.  Dr. Cambareri continued with conservative treatment which included, principally, the use of anti-inflammatory drugs.  AT 167-70. On April 8, 1999, Dr. Cambareri stated that plaintiff should perform no repetitive bending or lifting, could lift no more than five pounds, must alternate standing and sitting, and should pursue vocational retraining.  AT 169.

Plaintiff continued to treat with Dr. Cambareri after issuance on December 8, 1999 of the CPD.  On July 11, 2002, Dr. Cambareri noted that Mumm complained of acute back pain as a result of doing yard work.  AT 348.  At that time plaintiff was observed by Dr. Cambareri not to be in any apparent acute distress, and was found to be able to walk with no apparent pain or difficulty.  AT 348.  In his report of that visit, Dr. Cambareri also noted that the plaintiff "has good and bad days with his lower back pain" and "is able to carry out activities of daily living, but at times will exacerbate his pain."

AT 349.

During a follow-up visit to Dr. Cambareri on December 12, 2002, plaintiff was found to experience back tenderness to palpation and mild spasm at the L5-S1 level, with mild restriction of his lumbar range of motion. AT 350. Based upon his examination on that occasion, Dr. Cambareri reported that plaintiff's motor, sensory, vascular and deep-tendon-reflex testing were normal, and there was no evidence of atrophy or fasciculation (muscle twitching). *Id.*

Plaintiff was seen by Dr. Cambareri and his nurse practitioner, Donna Berthoff, on June 11, 2003. AT 352-55. In a report of that visit it was noted that plaintiff experienced "mild tenderness" over the right paraspinal area upon examination, with normal gait and heel/toe walking, full strength in his extremities graded 5/5, and no atrophy. AT 353. Plaintiff was determined to have moderate range of motion ("ROM") limitations of the lumbar spine and subjective numbness in his leg, with otherwise normal sensory results. *Id.* In a report of that visit Dr. Cambareri and NP Berthoff reported once again that plaintiff did not appear to be acute distress, and was able to walk with no apparent pain or difficulty. AT 353. In that report those professionals also wrote that "[e]ssentially [plaintiff's] back pain is unchanged." *Id.*

Plaintiff was again seen by Dr. Cambareri and NP Berthoff on October 21, 2003.  AT 356-58.  In a report of that visit, Dr. Cambareri and NP Berthoff wrote that plaintiff continued to experience lower back pain "that is essentially unchanged."  AT 357.  Once again, it was noted in that office visit that plaintiff did not appear to be in acute distress, and was able to walk without apparent pain or difficulty.  *Id.*  For a treatment plan, Dr. Cambareri and NP Berthoff noted that a conservative course of treatment would be followed and that the plaintiff would "continue working out at the gym 3 times per week as tolerated."  *Id.*

Treatment notes from Dr. Cambareri covering additional visits by the plaintiff from between April 20, 2004 and October 25, 2005 similarly reflect that over that interval plaintiff's condition remained essentially unchanged from the June 11, 2003 assessment.   In reports of those visits, plaintiff was repeatedly described by Dr. Cambareri as appearing well or in good health. See, *e.g.*, AT 357, 395, 398.

C.    Consultative Examiners

In addition to receiving the foregoing treatment, plaintiff has been examined consultatively on several occasions.  In a report of one such consultation, conducted on February 26, 1997 by Dr. Joseph Ortiz, an

orthopedic surgeon, it was noted that plaintiff suffered from lumbosacral strain resulting in a disability characterized as mild, partial and temporary.  AT 317-20.  A later consultation with orthopedic surgeon Dr. Charles Woodhouse, carried out on July 28, 1997, resulted in a finding of Grade I spondylolisthesis and lumbosacral sprain.  AT 321-24.  In his report of that consultation, Dr. Woodhouse noted that plaintiff had been released by Dr. Cambareri for light duty, and noted his suggestion that the plaintiff should "return to work."  AT 321-22.  These findings were largely replicated as a result of a consultation with Dr. Reinhard Bothe on March 10, 1998.  AT 325-29.

A post-CPD internal medicine examination was performed on May 23, 2003 by Dr. Richard Weiskopf.  AT 366-69.  Based upon his findings, Dr. Weiskopf concluded that plaintiff suffered from chronic low back pain with left-sided radiation in sciatic distribution, characterized as resulting in "mild limitation" in his ability to walk and bend, and "moderate" limitation in lifting and carrying, but with no limitation in sitting or standing.[6]  AT 369.

Plaintiff was consultatively examined by Dr. Traver, at the request of the

---

[6]      In his report, Dr. Weiskopf noted that plaintiff is able to engage in many daily living activities, including some amount of cooking, cleaning, laundry, and shopping, and is able to shower and dress himself.  AT 367.  Dr. Weiskopf also noted that plaintiff watches the television, listens to the radio, and reads, and is able to venture out to see friends and family as well as to visit his girlfriend.  *Id.*

New York Workers' Compensation Board, on December 6, 2004.  AT 388-92.

In a report prepared following that evaluation, Dr. Traver noted that there was

no evidence of paraspinal muscle spasm or list, and that plaintiff had the

ability to heel/toe walk multiple steps.  AT 391.  Dr. Traver also noted that

Mumm's gait was not antalgic and he demonstrated eighty degrees of straight

leg raising ("SLR") bilaterally, with intact neurological function in both lower

extremities, good reflexes and sensation, and further that he had good

strength throughout.  AT 391.

      D.    <u>Psychological Evaluations</u>

Michael Boucher, Ph.D., performed psychological evaluations of the

plaintiff on March 28, 2000, and again on January 11, 2001.  AT 360-62, 364-

65.  In his report of the first of those evaluations, Dr. Boucher diagnosed the

plaintiff as suffering from dyslexia, a reading disorder, and also noted a

weakness in his "fund of general verbal information", adding that he is "quite

slow in performing a variety of tasks."  AT 362.  The report found that plaintiff

was alert and oriented, had coherent and relevant speech, with normal and

appropriate affect, and normal memory with no evidence of a thought

disorder or restlessness.  AT 360-62.  Dr. Boucher further noted that "[t]here

appear to be serious limitations on [plaintiff's] abilities in reading and fund of

verbal information and more moderate problems with speed of performance and concentration.  His social skills appear intact based on behavioral observations."  AT 362.  Based upon his evaluation, Dr. Boucher noted that plaintiff possesses the intellectual capacity to benefit from additional, higher education and added that he could benefit from tutoring and other interventions.  *Id.*

In a report of the January 11, 2001 re-evaluation, Dr. Boucher noted that "[t]here appear to have been improvements in reading and fund of verbal information although both areas still fall somewhat below the level expected for [plaintiff's] age and full scale IQ scores.  Social skills are intact as was the case previously."  AT 365.  Aside from these observations, Dr. Boucher concluded that plaintiff's psychological evaluation results remained constant from the March 28, 2000 evaluation.  AT 364.

_____E.    RFC Assessments

Two residual functional capacity ("RFC") assessments appear in the administrative transcript.  The first, which pre-dates the CPD, was completed on February 18, 1999 by a non-treating, non-examining physician.  AT 171-78.  In that report the author found that plaintiff could lift ten pounds occasionally and less than ten pounds frequently; could stand and/or walk for

at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday, and was able to push and/or pull to an unlimited extent. AT 172.  The agency consultant also opined that Mumm could also occasionally kneel, crouch, crawl, and stoop, but never climb or balance.  AT 173.  The assessment found no manipulative, visual, communicative, or environmental limitations.  AT 174-75.

On September 3, 2003, Dr. In Seok reviewed plaintiff's medical records on behalf of the agency in order to determine his RFC.  Based upon his review Dr. Seok concluded that plaintiff is able to lift ten pounds occasionally and less than ten pounds on a frequent basis; is capable of standing and/or walking at least two hours in an eight hour work day and sitting for up to six hours each work day; and is otherwise limited only to occasional climbing, but otherwise capable of performing activities associated with sedentary work. AT 371-76.

II.   <u>PROCEDURAL HISTORY</u>

A.   <u>Proceedings Before The Agency</u>

Plaintiff protectively filed an application for disability insurance benefits under the Act on November 3, 1998, alleging an inability to work since August 11, 1996.  AT 87-89, 97.  In the CPD, dated December 8, 1999, plaintiff was

found to be disabled as of August 11, 1996, due to back disorder (discogenic and degenerative).  AT 200-06.  In finding disability, ALJ Joachim J. Volhard credited plaintiff's subjective complaints of debilitating pain, AT 205, and determined that plaintiff retained the RFC to perform the requirements of work except for standing and/or walking for more than a total of one hour in an eight-hour workday, sitting for more than one hour in an eight-hour workday, and lifting more than ten pounds occasionally.  AT 205.  After considering application of the grid but determinating that plaintiff's  limitations "significantly erode the occupational base of sedentary jobs, to the extent that there is not a significant number of jobs remaining in the economy which the claimant can perform[,]", ALJ Volhard determined that he was at that point disabled.  AT 205-06.

On June 24, 2003, the agency notified plaintiff that it had conducted a routine, continuing disability review of his case, and found that his disabling condition had improved as of June 2003.  AT 213-14.  On November 20, 2003, plaintiff's case was reviewed by an agency hearing officer who, based upon his findings, independently concluded that plaintiff had undergone a medical improvement.  AT 223-30.

At plaintiff's request, a hearing was held on February 28, 2006 before

ALJ Joseph G. Medicis, Jr. to address the issue of plaintiff's continued eligibility for benefits under the Act.  AT 31-49.  Following that hearing, on April 24, 2006, ALJ Medicis issued a decision in which he concluded that plaintiff's disability had ended as of June 1, 2003.  AT 14-22.  In his decision, ALJ Medicis applied an amalgamation of the standard for termination of Social Security benefits and the now familiar, five step algorythm for determining disability in the first instance.

At the outset, ALJ Medicis noted that at the time of the CPD, plaintiff was found to suffer from two medically determinable impairments, including Grade I spondylosisthesis at L5-S1 with spondylolysis associated with lumbar strain and sciatica, as well as GERD, and that those impairments resulted in such a limited RFC that plaintiff could engage in "no usefully sustained work." AT 16.

Turning to the issue of improvement, ALJ Medicis first noted that plaintiff's GERD did not appear to be medically significant in terms of limiting his ability to perform work-related functions, "if it ever was so."  AT 17. Addressing plaintiff's back condition, ALJ Medicis noted several indicia of improvement in the available medical records, including reports from plaintiff's treating physician, Dr. Cambareri, as well as the evaluation

-14-

performed by Dr. Weiskopf on May 23, 2003.  AT 17-18.

ALJ Medicis next attempted to determine plaintiff's RFC concluding,

based primarily upon the RFC assessment of Dr. In Seok as well as Dr.

Cambareri's own observation of plaintiff as "a suitable candidate for 're-

education for more sedentary work [,]'", that plaintiff has the capacity to lift

and carry ten pounds, both occasionally and frequently; to sit for up to six

hours in a routine eight hour work day and to stand or walk for up to two

hours in such a workday, all findings consistent with plaintiff's ability to

perform sedentary work.  AT 18-19.  In making his RFC finding, ALJ Medicis

considered but rejected plaintiff's complaints of disabling physical and mental

impairments, based upon the lack of support in available medical records as

well as the extent of plaintiff's daily activities.  AT 20.  Finding medical

improvement related to plaintiff's ability to work, based upon a less restrictive

RFC than reflected in the CPD, AT 20, ALJ Medicis next turned to plaintiff's

ability to perform work.  AT 21.  After concluding that plaintiff does not retain

the RFC to perform his past relevant work as a machine operator and

security guard, both falling in the light to medium exertional category,

applying the grid as a framework, and utilizing his RFC findings, he

concluded that plaintiff is not disabled, and accordingly found that his

disability ended as of June 1, 2003.  AT 21.  The ALJ next found that the medical evidence established plaintiff did not develop any additional impairments of significance between the CPD and June 1, 2003, and that plaintiff continued to experience the same impairments that he had at the time of the CPD.  AT 16.  The ALJ went on to conclude that those impairments did not, either singly or in combination, meet or medically equal in severity any of the presumptively disabling impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *Id.*

ALJ Medicis' opinion became the final determination of the Commissioner when, on June 12, 2006, the Social Security Administration Appeals Council denied plaintiff's request for a review of that decision.  AT 7-9.

B.    This Action

Plaintiff commenced this action on August 9, 2006.  Dkt. No. 1.  Issue was subsequently joined by the Commissioner's filing of an answer on September 18, 2006, Dkt. No. 4, preceded by the submission on September 8, 2006 of an administrative transcript of the proceedings and evidence before the agency.  Dkt. No. 3.  With the filing of plaintiff's brief on December 5, 2006, Dkt. No. 6, and that on behalf of the Commissioner on December 11,

2006, Dkt. No. 8, this matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).  *See also* Fed. R. Civ. P. 72(b).[7]

## III.   DISCUSSION

     A.   Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the

--------

[7]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., then-Chief United States Magistrate Judge, on January 28, 1998, and later amended and reissued by then-Chief District Judge Frederick J. Scullin, Jr., on September 19, 2001. Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

ultimate conclusion reached is arguably supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427; *Martone*, 70 F. Supp. 2d at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the

evidence must also include that which detracts from its weight." *Williams*,

859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488,

715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have

been applied, and/or that substantial evidence does not support the agency's

determination, the agency's decision should be reversed.  42 U.S.C. § 405(g);

*see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand

the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g),

particularly if deemed necessary to allow the ALJ to develop a full and fair

record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148

(citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand

pursuant to sentence six of section 405(g) is warranted if new,

non-cumulative evidence proffered to the district court should be considered

at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*,

940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is

appropriate when there is "persuasive proof of disability" in the record and it

would serve no useful purpose to remand the matter for further proceedings

before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R.*

*Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and*

*Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.   <u>Disability Determination - The Five Step Evaluation Process</u>

The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   In addition,

the Act requires that a claimant's

> physical or mental impairment or impairments [must
> be] of such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§

404.1520, 416.920.  The first step requires a determination of whether the

claimant is engaging in substantial gainful activity; if so, then the claimant is

not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b),

416.920(b).  If the claimant is not gainfully employed, then the second step

involves an examination of whether the claimant has a severe impairment or

combination of impairments which significantly restricts his or her physical or

mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from such an impairment, the agency must

next determine whether it meets or equals an impairment listed in Appendix 1

of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404,

Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."

*Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584

(2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

assessment of whether the claimant's residual functional capacity ("RFC")

precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter

the agency must examine whether the claimant can do any other work.  *Id.* §§

404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies

with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*,

728 F.2d at 584.  Once that burden has been met, however, it becomes

incumbent upon the agency to prove that the claimant is capable of

performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that

burden has been met, the ALJ should consider the claimant's RFC, age,

education, past work experience, and transferability of skills.  *Ferraris*, 728

F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

> C.    Standard for Termination of Benefits

     In a case such as this, where a finding of disability has resulted in the

granting of benefits under the Act, the Commissioner is statutorily charged

with the duty to engage in a continuing, periodic review of the claimant's

condition.  42 U.S.C. § 421(i); *see also* 42 U.S.C. § 425(a).  If, based upon

that review, the Commissioner determines that the disabling condition has

subsided, does not exist, or is not disabling, a termination of benefits may be

ordered.  42 U.S.C. § 423(f).  In making a review to determine whether

cessation of Social Security benefits is warranted, the Commissioner must

examine the claimant's "current" condition – a term ordinarily requiring

assessment of the plaintiff's condition at the time of the hearing.[8]  *Difford v.*

*Sec'y of Health & Human Servs.*, 910 F.2d 1316, 1320 (6th Cir. 1990).

---

[8]    As an exception to this general rule, in cases where disability benefits under Title II have been terminated and the claimant's insured status ended prior to the hearing date, the critical date is the last date of insured status.  *Henley v. Commissioner of Soc. Sec.*, 58 F.3d 210, 212-13 (6th Cir. 1995), *cert. denied sub nom*, *Henley v. Chater*, 516 U.S. 1081, 116 S. Ct. 792 (1996).

Generally speaking, termination of benefits is appropriate under section 423(f) and the corresponding regulations when 1) there has been medical improvement related to the claimant's ability to work; 2) the claimant has benefitted from advances in medical or vocational technology related to the ability to work, regardless of the lack of medical improvement; 3) the claimant has undergone vocational therapy related to ability to work; 4) based on new or improved diagnostic or evaluative techniques it is demonstrated that claimant's condition was not as disabling as previously regarded; or 5) substantial evidence shows that an earlier finding of disability was erroneous.[9]  42 U.S.C. 423(f); 20 C.F.R. §§ 404.1594(d), 416.994(b)(3).

Where a claimant's medical condition improves to the extent that he or she can engage in substantial gainful activity, that party will no longer be entitled to benefits under the Act.  42 U.S.C. § 423(f); 20 C.F.R. § 404.1594.  In order to support the termination of benefits, the Commissioner must meet a burden of showing, by substantial evidence, that a medical improvement has taken place in a claimant's ability to perform work activity.  42 U.S.C. §

---

[9]      The regulations also provide that if the claimant is engaged in substantial gainful activity – a factor which under the five step test would ordinarily result in a finding of no disability – termination of benefits is warranted.  20 C.F.R. § 404.1594(d); *see also* 42 U.S.C. § 423(f).  This can include part-time employment with earning levels sufficient to trigger the rebuttable presumption of substantial gainful activity, permitting termination of benefits even without a showing of medical improvement.  *Katz v. Sec'y of Health & Human Servs.*, 972 F.2d 290, 292-94 (9th Cir. 1992).

423(f)(1)(A); 20 C.F.R. § 404.1594.  A medical improvement is defined as "any decrease in the medical severity" of an impairment.  20 C.F.R. § 404.1594(b)(1).  Any decrease must be based upon changes in the symptoms, signs, and/or laboratory findings associated with the impairment. *Id.*  To find medical improvement, the Commissioner must compare the prior and current medical evidence to determine whether there have been any changes in signs, symptoms, and laboratory findings associated with the claimant's impairment.  20 C.F.R. §§ 404.1594(b)(7), 404.1594(c)(1).

If there has been a medical improvement, the Commissioner must then determine whether the improvement is related to the claimant's ability to work.  20 C.F.R. § 404.1594(a).  A medical improvement will be related to the claimant's ability to work where it results in a decrease in the severity of the impairment present at the time of the most recent favorable medical decision and an increase in the claimant's functional capacity to perform basic work activities.  20 C.F.R. § 404.1594(b)(3).  Basic work activities include abilities and attributes necessary to do most jobs, such as walking, standing, pushing, pulling, reaching, carrying, hearing, speaking, remembering, and using judgment.  20 C.F.R. § 404.1594(b)(4).  Even where a medical improvement related to claimant's ability to work has occurred, in most cases the

Commissioner must show that the claimant is able to engage in substantial gainful activity before he will be found no longer disabled.  20 C.F.R. § 404.1594(a).  In examining claimant's ability to work, all impairments existing at the time of analysis must be considered.  20 C.F.R. § 404.1594(b)(5).

> D.    The Evidence in this Case

In support of his challenge to the agency's determination, plaintiff raises several arguments, contending that the ALJ improperly 1) concluded that his condition had improved; 2) failed to give proper weight to the opinions of Dr. Cambareri, his treating physician, characterized by him as suggesting his inability to perform a full range of sedentary work; 3) improperly evaluated his credibility, rejecting his claims of disabling mental and physical conditions; and 4) impermissibly applied the grid in order to determine that he can perform work available in significant numbers in the national economy, given the existence of non-exertional limitations related to his diagnosed learning disability, substantially eroding the job base upon which the grid is predicated.

> 1.    Medical Improvement

As stated above, a medical improvement is defined as "any decrease in the medical severity" of an impairment.  20 C.F.R. § 404.1594(b)(1).  To find

medical improvement, the Commissioner must compare the prior and current medical evidence to determine whether there have been any changes in signs, symptoms, and laboratory findings associated with the claimant's impairment.  20 C.F.R. §§ 404.1594(b)(7), 404.1594(c)(1).  In this case, the ALJ analyzed the available medical evidence, and found that plaintiff had undergone a medical improvement as of June 1, 2003.  AT 17-19.  That determination is amply supported by substantial evidence, including reports of plaintiff's treating physician, Dr. Cambareri, buttressed by the results of an examination conducted in May of 2003 by Dr. Weiskopf and a review of plaintiff's medical records conducted in September, 2003 by Dr. In Seok.

Looking first at the pre-CPD findings as a frame of reference, the medical evidence reveals that during that time plaintiff was diagnosed as suffering from a bulging disc at L4-5 spondylolesthesis and spondylolysis.  AT 132, 134, 136.  On June 23, 1998 plaintiff was found by his treating physician, Dr. Cambareri, to be in moderate distress within antalgic gait and station, with tenderness to palpation of the spine, and with a range of motion of only 30 degrees of flexion with increased back pain, and significant back pain with extension of his legs.  AT 143.  While on August 14, 1998 Dr. Cambareri found plaintiff capable of lifting up to ten pounds, with no repetitive

bending and allowance to sit and stand as needed, AT 146, Dr. Cambareri

issued a more restrictive finding in April of 1999, concluding that plaintiff

should perform no repetitive bending or lifting, could lift no more than five

pounds, must alternate between standing and sitting, and should pursue

vocational retraining.  AT 169.

When considered against this backdrop, medical evidence adduced

after the CPD supports the ALJ's finding of medical improvement.  While on

July 11, 2002, Dr. Cambareri did note that plaintiff reported acute back pain

complaints, that was only as a result of apparent aggravation based upon his

having done yard work.  AT 348.  At that time, plaintiff reported being able to

carry out activities of daily living, which "at times" exacerbated his pain.  AT

349.

On June 11, 2003, Dr. Cambareri reported that plaintiff experienced

"mild tenderness" over the right paraspinal area upon examination, with

normal gait and heel/toe walking, full strength in his extremities graded 5/5,

and no atrophy.  AT 353.  In that report, Dr. Cambareri also wrote that plaintiff

had moderate range of motion limitations of the lumbar spine and subjective

numbness in his leg, with otherwise normal sensory results.  *Id.*  On October

21, 2003, Dr. Cambareri reported that plaintiff's back pain was unchanged,

and his numbness was improved.  AT 356-57.  Dr. Cambareri's treatment

notes dated from April 20, 2004 through October 25, 2005 indicate that

plaintiff's condition remained essentially unchanged from his June 11, 2003

assessment.  AT 393-410.  In those notes, plaintiff was repeatedly described

by Dr. Cambareri as appearing well or in good health, AT 357, 395, 398, and

several of his more recent reports note that plaintiff did not appear to be any

acute distress.  *E.g.*, AT 348, 395, 401.

These findings are augmented by conclusions of Dr. Weiskopf based

upon his May 23, 2003 examination, and Dr. Seok's report of September 3,

2003, providing adequate support for the ALJ's conclusion that plaintiff had

experienced medical improvement in his back condition.[10]

    2.   <u>Treating Physician Rule</u>

---

[10]    In support of his challenge of the ALJ's determination, plaintiff argues that the ALJ failed to consider the existence of a new medical condition – a right knee injury – when considering the issue of medical improvement. *See* Plaintiff's Memorandum (Dkt. No. 6) at 5-7. In making that argument plaintiff refers principally to the reports of MRI testing, conducted on April 26, 2005, revealing a "large horizontal tear involving posterior horn and body of medial meniscus which extends to [the] articular surface". AT 194. This report also states, however, that "[d]espite [the tear], configuration of medial meniscus is relatively well preserved.  Lateral meniscus shows only minimal mucoid change but is considered essentially normal.  Cruciate and collateral ligaments are intact.  No focal chondral defect or joint space narrowing is seen and there is normal marrow signal throughout." *Id.*  The medical evidence in the record fails to reveal any significant work-related limitations associated with plaintiff's knee injury.  Indeed, reports from Dr. Cambareri, plaintiff's treating physician, are silent with regard to any pain or limitations associated with that condition. *See, e.g.,* AT 393-409.  Based upon these facts, I find no basis to conclude that plaintiff's knee condition should factor into either the medical improvement analysis or the ultimate, disability determination.

Plaintiff argues that because Dr. Cambareri is properly regarded as his treating physician, the ALJ erred in failing to give controlling weight to his opinion regarding his disability status.  Dkt. No. 6 at 8-9.  Ordinarily, a treating physician's opinion is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record.  *Veino*, 312 F.3d at 588; *Barnett*, 13 F. Supp. 2d at 316.[11]  Such opinions are not controlling, however, if contrary to other substantial evidence in the record, including the treating physician's own contradictory findings as well as opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the

---

[11]     The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions from your treating sources . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.   When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Commissioner.  *Veino*, 312 F.3d at 588.

The ALJ must properly analyze the reasons for giving less than controlling weight to a treating physician's opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran*, 362 F.3d at 32.  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).  The ultimate determination of whether a person meets the statutory definition of disability, however,  is left with the Commissioner and the ALJ is under no duty to afford controlling weight to any opinion as to such determination.  20 C.F.R. § 416.927(e)(1).

In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).  When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Failure to apply the appropriate legal standards for considering a treating physician's opinion is a proper basis for reversal and remand, as is the failure to provide reasons for

rejection of a treating physician's opinion.  *Johnson*, 817 F.2d at 985-86;

*Barnett*, 13 F. Supp. 2d at 316-17.

On March 10, 2004, Dr. Cambareri completed a medical source

statement addressing plaintiff's ability to do work-related activities, in which

he opined that plaintiff could sit for less than six hours per eight-hour workday

and stand for less than two hours per eight-hour workday, and must alternate

sitting and standing.  AT 412-13.  Dr. Cambareri also reported that plaintiff

could occasionally lift less than ten pounds and could do no frequent lifting,

that he was limited in both upper and lower extremities, and that he could

never climb, balance, kneel, crouch, crawl, or stoop.  AT 412-13.  The ALJ

considered this evaluation and decided that it was inconsistent with Dr.

Cambareri's own treatment notes and with the medical record as a whole,

observing that

> though the opinions of the treating physician are
> granted the additional weight due to them pursuant
> to 20 C.F.R. Section 404.1527(d), they do not
> additionally meet the extra requirements of Social
> Security Ruling 96-2p where it is set forth that even
> such opinions must be supported by adequate
> clinical reporting from the source himself and in any
> event must be not inconsistent with the entirety of
> the medical evidence in the case file.

AT 19.

The ALJ's decision in this regard is supported by substantial evidence. Dr. Cambareri's treatment notes indicate that from June of 2002 onward, plaintiff routinely appeared "well," with mild tenderness over the right paraspinal area, mild ROM limitations, normal gait and heel/toe walking, normal sensory results, full strength in his extremities, and no atrophy.  AT 353, 356-57, 393-410.  Dr. Cambareri consistently assessed plaintiff as "partially disabled," often accompanying this assessment by noting that he was taking classes at a community college to prepare him for more sedentary work.[12]  AT 351, 354, 358, 402, 405, 409.

The ALJ's rejection of the limited work-related assessment of Dr. Cambareri is also supported by other evidence in the record.  Dr. Weiskopf's internal medicine examination, performed on May 23, 2003, for example, found that plaintiff suffered only "mild limitation" of walking and bending, "moderate" limitation in lifting and carrying, and no limitation in sitting or standing.  AT 369.  Similarly, Dr. Seok's evaluation of September 3, 2003 found that plaintiff retained the RFC to perform at least sedentary work.  AT 371-76.  Dr. Traver, who examined Plaintiff on December 6, 2004, found no

---

[12]    To the extent that Dr. Cambareri's reports speak to the ultimate issue of disability, they are not entitled to special deference since they address an issue specifically reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

evidence of paraspinal muscle spasm or list.  AT 391.  According to Dr.

Traver, plaintiff had the ability to heel/toe walk multiple steps, his gait was not

antalgic, and he demonstrated eighty degrees of straight leg raising ("SLR")

bilaterally with intact neurological function in both lower extremities, good

reflexes and sensation, and good strength throughout.  AT 391.  Careful

review of the record reveals that Dr. Cambareri's March 10, 2004 assessment

is distinctly at odds with virtually all other evidence in the record, including

that physician's own office notes.  Accordingly, the ALJ did not err in rejecting

that assessment, to the extent it is modestly in conflict with the ALJ's RFC

findings.

### 3.  Rejection of Plaintiff's Subjective Complaints

Plaintiff also argues that the ALJ failed to properly assess his subjective

complaints of pain, contending that the ALJ did not provide "specific reasons"

for his credibility finding.

The ALJ has discretion to appraise the credibility of witnesses, including

testimony of a claimant concerning subjective complaints of disabling pain.

*See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984).  After

considering a claimant's subjective testimony, the objective medical

evidence, and any other factors deemed relevant, the ALJ may accept or

reject a claimant's subjective testimony.  20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4); *Martone*, 70 F. Supp. 2d at 151.  If the ALJ rejects a claimant's

subjective testimony, he or she must explicitly state the basis for doing so

with sufficient particularity to enable a reviewing court to determine whether

those reasons for disbelief were legitimate, and whether the determination is

supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 151 (citing

*Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the

ALJ's findings are well-articulated and supported by substantial evidence, the

reviewing court must uphold the ALJ's decision to discount plaintiff's

subjective complaints of pain.  *Aponte v. Sec'y, Dep't of Health & Human*

*Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citing *McLaughlin v. Sec'y of*

*Health, Educ. & Welfare*, 612 F.2d 701 (2d Cir. 1980)).

During the hearing plaintiff described the constant back and leg pain

which he experiences.  AT 40-45.  In his decision, the ALJ considered those

subjective complaints, but found them not to be fully credible in view of the

extent of plaintiff's daily activities, the minimal clinical findings and the nature

of medical treatment, the failure of plaintiff's treating physician to impose

credible long-term functional limitations or restrictions on plaintiff's ability to

perform work activities, and the assessments of consultative and expert

medical examiners from the agency.  AT 20.  Explaining the basis for his determination, the ALJ stated that "[plaintiff's] medically determinable impairment could have reasonably been expected to produce only some of the alleged symptoms, and that [plaintiff's] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  AT 20.

The ALJ's assessment of plaintiff's credibility is amply supported by substantial evidence in the record. The medical evidence in the record fails to support the existence of such a condition as to cause the debilitating pain claimed by the plaintiff, and the extremely conservative course of treatment, including the medication prescribed and taken, belies the plaintiff's claim. Moreover, the extent of plaintiff's daily activities, which apparently include performing yard work, cooking, cleaning, and shopping, as well as the ability to shower and dress himself, *see* AT 348, 367, and his attendance at classes, and exercising at a gym up to three times each week, support the ALJ's finding regarding credibility.[13]  *See* AT 343, 351, 354, 357, 399, 405.

---

[13]      In support of his challenge plaintiff suggests the need for the ability to freely alternate between sitting and standing, pointing to the fact that he has been granted this accommodation by his professors at the community college which he attends.  *See* AT 43-44.  This requirement, however, does not undermine the ALJ's finding that plaintiff retains the ability to perform the exertional requirements of sedentary work.  As the Second Circuit has noted, "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-

In sum, it appears to the court that the ALJ applied the proper analysis in discounting plaintiff's subjective complaints of pain, and the ALJ's skepticism in this regard is properly supported by substantial evidence in the record, and thus is not subject to being disturbed on review. *Aponte,* 728 F.2d at 591.

### 4.    Use of Medical-Vocational Guidelines

Plaintiff's final argument in support of his challenge to the ALJ determination is that the existence of his diagnosed learning disability, a non-exertional impairment, made reliance by the ALJ upon the grid as determining disability inappropriate.

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grid. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  The grid takes into consideration a claimant's RFC, as well as his or her age, education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy. *Rosa*, 168 F.3d at 78.  Whether or not the grid should be applied in order to make a step five determination presents a case-specific inquiry which

---

belted passenger in the center seat on a transcontinental flight." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

depends on the particular circumstances involved.  *Bapp*, 802 F.2d at 605.  If

a plaintiff's situation fits well within a particular classification, then resort to

the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments,

including pain, <u>significantly</u> limit the range of work permitted by exertional

limitations, then use of the grid is inappropriate, in which case further

evidence and/or testimony is required.[14]  *Rosa*, 168 F.3d at 78; *Bapp*, 802

F.2d at 605-06.   Non-exertional limitations include difficulty functioning

because one is nervous, anxious, or depressed; difficulty maintaining

attention or concentration; or difficulty understanding or remembering detailed

instructions.  20 C.F.R. § 404.1569a(c).

Plaintiff's argument that he suffers from a learning disorder which

imposes non-exertional limitations on his ability to perform work activities

finds little support in the record.

Plaintiff places heavy reliance upon a March 28, 2000 report from

Michael Boucher, Ph.D., who diagnosed him as suffering from dyslexia, a

---

[14]     As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's
> impairments that affect [his or] her ability to meet the
> requirements of jobs other than strength demands, and
> includes manipulative impairments and pain.

*Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. §
404.1569(a), (c)).

reading disorder.  AT 362.  Conspicuously lacking, however, is any evidence in the record to suggest that the dyslexia results in non-exertional limitations upon plaintiff's ability to perform work-related functions.  Indeed, the March 28, 2000 examination relied upon by the plaintiff found that plaintiff was alert and oriented, had coherent and relevant speech, had normal and appropriate affect, and had normal memory, with no evidence of a thought disorder or motor restlessness.  AT 360-62.  A subsequent examination by Dr. Boucher performed on January 11, 2001 revealed that plaintiff's reading abilities had shown improvement, and noted that his affect and memory remained constant from the March 28, 2000 examination.  AT 364-65.

These examinations were performed over three years before the alleged disability cessation date, after which point plaintiff consistently attended classes at a local college, and reported having no problems associated with his course work.  AT 343, 351, 354, 357, 399, 405.  The examinations themselves do not indicate any non-exertional impairments which would place functional limitations on plaintiff's ability to do work.[15]  *See* 20 C.F.R. § 404.1569a(c).

---

[15]     It should be noted that plaintiff did not allege dyslexia or a learning disorder in his application for benefits; instead, this issue was raised for the first time in his brief. AT 97; Dkt. No. 6 at 6, 13.

In sum, there is no evidence in the record to suggest that plaintiff's diagnosed dyslexia imposed any non-exertional limitations that would erode the job base upon which the grid is predicated.  And, having found that the ALJ's RFC's finding is well-supported, I conclude that his resort to the grid for a determination of disability was appropriate, obviating the need at step five for elicitation of testimony from a vocational expert.

IV.    SUMMARY AND RECOMMENDATION

A review of the record in this case, conducted applying the requisite deferential standard, reflects that the ALJ applied the proper legal standards to the evidence in the record, and that his finding that disability ceased as of June 1, 2003 garners sufficient support in the record.  I find that the rejection of the limited, contrary opinion of plaintiff's treating physician, Dr. Cambareri, was appropriate and properly explained.  Additionally, I find that the ALJ appropriately evaluated plaintiff's subjective complaints of debilitating pain, rejecting them as not fully credible in view of the evidence in the record. Finally, I find that the ALJ properly concluded that plaintiff does not suffer from nonexertional impairments which would significantly erode the job base upon which the grid is predicated, and that his use of the grid to determine the issue of disability was therefore proper.

Based on the foregoing, it is hereby

RECOMMENDED, that defendant's motion for judgment on the pleadings be GRANTED, that the Commissioner's determination that disability ceased as of June 1, 2003 be AFFIRMED, and that plaintiff's complaint in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.


Dated:      February 13, 2008
              Syracuse, New York



David E. Peebles
U.S. Magistrate Judge

-40-